1  ALEXANDRA S. KELLY (SBN 305811)
   akelly@btlaw.com
2  BRIAN NGUYEN (SBN 336704)
   brian.nguyen@btlaw.com
3  **BARNES & THORNBURG LLP**
   2029 Century Park East, Suite 300
4  Los Angeles, California  90067
   Telephone: (310) 284-3880
5  Facsimile:  (310) 284-3894

6  Attorneys for Defendants Audiophile Music Direct
   Inc., d/b/a Music Direct, a Nevada Corporation;
7  Mobile Fidelity Sound Lab, Inc., an Illinois
   corporation

8

9                    UNITED STATES DISTRICT COURT

10                   CENTRAL DISTRICT OF CALIFORNIA

11

12 | MARK ALLEN, an individual; and on      | Case No.  2:22-cv-8146-GW-MRWx
13 | behalf of himself and all others
   | similarly situated,
14 |                                        | **DEFENDANT MOBILE FIDELITY**
   |                Plaintiff,               | **SOUND LAB, INC.'S ANSWER TO**
15 |                                        | **SECOND AMENDED**
   | v.                                     | **COMPLAINT; DEMAND FOR**
16 |                                        | **JURY TRIAL**
   | AUDIOPHILE MUSIC DIRECT INC.,
17 | d/b/a Music Direct, a Nevada
   | corporation; MOBILE FIDELITY
18 | SOUND LAB, INC., an Illinois
   | corporation; and DOES 1 through 50,
19 | inclusive,
20 |                Defendants.

21
   / / /
22
   / / /
23
   / / /
24
   / / /
25
   / / /
26
   / / /
27

28

1    Defendant MOBILE FIDELITY SOUND LAB, INC. ("MoFi" or
2  "Defendant") hereby answers Plaintiff Mark Allen's ("Plaintiff") Second Amended
3  Complaint ("SAC") as follows:
4    Defendant denies each and every allegation, statement, matter, and thing
5  contained in Plaintiff's SAC except as is expressly admitted or alleged hereinafter.
6    The repetition of some of the SAC's subheadings and allegations below is
7  done solely for organizational purposes and is not an admission as to their truth.
8                    __THE NATURE OF THIS ACTION__
9    1.    This is an action for fraud and deceptive and misleading practices
10  brought against defendants arising from their production and sale of vinyl records
11  that defendants marketed as "cut" directly from the original analog master tapes for
12  the recordings as part of an all-analog mastering chain, but failed to disclose
13  included a digital step in the mastering process. Indeed, for years defendants
14  concealed from consumers that their vinyl records at issue here were in fact cut
15  from digital recordings that defendants made from analog tapes of the recordings.
16    **ANSWER:** Denied.
17    2.    Central to the marketing of defendants' records was their claim that
18  they cut their records from the original analog master tapes to induce consumers to
19  pay premium prices for the records because the audiophile consumers who purchase
20  such records reasonably believed the records were all-analog - - also known in the
21  audiophile community as "AAA records or AAA transfers." Such AAA re-issues of
22  popular jazz, rock and other genres of music have commanded premium prices for
23  vinyl recordings during the renaissance period for vinyl records, which began in the
24  early 1990s, when companies such as Classic Records began making vinyl reissues
25  of original popular recordings cut directly from the analog master tapes for such
26  recordings.
27    **ANSWER:** Denied.
28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

3.     Defendant Mobile Fidelity Sound Lab, Inc. ("MoFi"), originally founded in California and based in Sebastopol, California, jumped on the vinyl renaissance bandwagon by making and selling reissues that it branded "Original Master Recording" ("OMR") to lead consumers to believe their vinyl records bearing this mark were cut directly from the original analog master tapes for such recordings. Beginning in or around 2016, MoFi also started selling a super-premium version of their OMRs known as an "Ultradisc One-Step Pressing" or "UD1S," which defendants falsely represented were cut directly from the original analog master tapes of the recordings as part of an all-analog mastering chain.

**ANSWER:**  Defendant admits that it was originally founded in California and that it produces and sells various types of vinyl records, including those in its "Original Master Recording" and "Ultradisc One Step" series.  Defendant denies the remaining allegations in Paragraph 3.

4.     MoFi repeatedly represented to consumers in marketing and advertising material on their website, covers and inserts for their records and in a 2017 video interview of their sound engineers in California that their records were produced with an "all analog mastering chain," without disclosing they were actually cutting their OMRs and UDISs from digital files. Plaintiff is informed and believes and thereon alleges that MoFi has been cutting the lacquers used to press most, if not all, of their records from direct stream digital (DSD) files since in or around 2011.

**ANSWER:**  Denied.

5.     Plaintiff is informed and believes and thereon alleges that MoFi and Defendant Audiophile Music Direct, Inc. ("Music Direct") are both owned and controlled by James R. Davis ("Jim Davis" or "Davis").  Music Direct is one of several distributors and retailers of MoFi records.

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

**ANSWER:** Defendant admits the allegations in Paragraph 5 with respect to MoFi. Defendant neither admits nor denies the allegations in Paragraph 5 directed to Music Direct.

6.     MoFi and Music Direct concealed the digital step in the mastering chain for their MoFi records so that they could charge premium pricing for their records as if they were all-analog or AAA transfers. For example, defendants' OMR titles have been sold by defendants in the range of approximately $30 to $75 per title and UDISs releases have been sold by defendants for approximately $100 to $125 per title.

**ANSWER:** Defendant admits that it produces and sells various types of vinyl records, including those in its "Original Master Recording" and "Ultradisc One Step" series. Defendant denies the remaining allegations in Paragraph 6.

7.     All analog vinyl reissues have been the most sought-after records for years. Companies that make vinyl reissues know lacquers mastered directly from the original analog master tapes have greater intrinsic value to consumers than records cut from a digital file.

**ANSWER:** Denied. Defendant further states as follows: all vinyl records are by definition "analog" but the value of any particular record (whether produced from analog or digital original master recordings, or whether there is or is not a digital process used in the initial recording, editing, mixing, remixing, mastering, or remastering) depends on many variables, including, without limitation, a record's content and scarcity.  Vinyl records produced with MoFi's proprietary mastering and production processes, whether they include the use of DSD, or not, are recognized in the industry and trade as superior sounding and collectible records.

8.     The desire for high-quality reissues of popular vinyl recordings produced during the height of the vinyl age of music during the 1950s to the 1970s stems from the fact that it is difficult and often very costly for audiophile consumers and record collectors to locate and purchase an original pressing of an

BARNES & THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1    album in a mint or near mint condition at less than an exorbitant price. All of these
2    original pressings were cut from analog master tapes because digital recording
3    technology for music production did not exist or become commonplace until the
4    1980s. Therefore, an all-analog reissue allows a consumer the promise of obtaining
5    the closest thing to an original pressing of a title, which in some cases may even
6    sound better than the original pressing due to advances in vinyl record formulations
7    used today that lower the noise floor of the record.

8    **ANSWER:**  Denied.

9        9.    The desire for all-analog reissues also stems from the fact that a record
10   pressed from a lacquer cut directly from the original master tape of a recording puts
11   the listener closer to hearing the original master tape, which is the ultimate goal of
12   producing any vinyl record; i.e., to put the listener as close as possible to the
13   performer.

14   **ANSWER:**  Denied.

15       10.   By contrast, records cut from digital or those that have a digital step in
16   the mastering chain are inherently less valuable to consumers than all-analog
17   records. Defendants know this, which is why they represented for years that their
18   records were cut directly from the original master tapes and why they concealed the
19   digital step in their mastering chain from consumers.

20   **ANSWER:**  Denied.  Defendant further answers that it has found DSD to be
21   neutral and transparent audibly, and when it is chosen to be used in Defendant's
22   proprietary mastering process in combination with Defendant's proprietary state-of-
23   the-art equipment, it does not diminish, but rather enhances the quality of sound of
24   records produced therefrom.  Defendant's proprietary process enables its highly-
25   skilled, expert mastering engineers to extract more information from the original
26   master recordings, which information is then sent back to the analog domain to be
27   edited in analog and cut onto laquers on Defendant's analog lathe to create its

28

Barnes &
Thornburg LLP
Attorneys At Law
Los Angeles

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

1   superior sounding, highly regarded, and collectible analog vinyl records.   See
2   additionally Defendants Answer to Paragraph No. 7.

3       11.   Had defendants disclosed that the lacquers used to press their
4   premium- priced records were cut directly from digital files, and not original analog
5   master tapes, plaintiff and the putative class members would not have purchased the
6   records or would have paid substantially less for the records than they did.
7   Defendants' failure to disclose this fact caused damage and injury to plaintiff and
8   the class members.

9       **ANSWER:** Denied.

10      12.   Plaintiff brings this action individually and on behalf of all other
11  similarly situated purchasers to recover damages and restitution for: (1) fraud; (2)
12  violations of California's Unfair Competition Law, Cal. Bus. & Profess. Code §
13  17200, et. seq.; and violations of California's Consumer Legal Remedies Act, Cal.
14  Civ. Code § 1750, et. seq.

15      **ANSWER:** Defendant admits that Plaintiff purports to bring this action as a
16  class action, but denies the basis for such an action, denies this action meets class
17  certification requirements, denies that Plaintiff is entitled to any relief, and denies
18  the remaining allegations in this paragraph, except as otherwise admitted.

19                        **THE PARTIES**

20      13.   Plaintiff Mark Allen ("Allen") is an individual residing in Orange
21  County, California.

22      **ANSWER:** Defendant lacks information or knowledge sufficient to form a
23  belief as to the truth or falsity of the allegations in Paragraph 13, and thus denies the
24  same.

25      14.   Plaintiff is informed and believes and thereon alleges that defendant
26  MoFi, originally founded in California, is an Illinois corporation whose business
27  operations are conducted in Sebastopol, California, where MoFi's record production
28  facility and work force have been located for years. MoFi is a manufacturer,

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

5

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

1   wholesale distributor and retailer of vinyl records and Super Audio CDs (SACDs).

2   According to MoFi's Notice of Removal [Dkt. #1 at 5], its principal place of

3   business, where "its officers direct, control, and coordinate" its activities, is in

4   Chicago, Illinois.

5         **ANSWER:**  Defendant admits it is an Illinois corporation, originally founded

6   in California, and that its principal place of business is in Chicago, Illinois where its

7   officers direct, control, and coordinate its activities, which include, without

8   limitation, the manufacturing and wholesale and retail sale of vinyl records and

9   Super Audio CDs.  Defendant denies the remaining allegations in Paragraph 14.

10        15.   At all times relevant hereto, MoFi's global website https://mofi.com/

11  contained the following choice of law and choice of forum provision in its Terms

12  and Conditions for any dispute arising out of relating to the purchase of any MoFi

13  record product: "Your use of this site shall be governed in all respects by the laws

14  of the state of California, U.S.A., without regard to choice of law provisions, and

15  not by the 1980 U.N. Convention on contracts for the international sale of goods.

16  You agree that jurisdiction over and venue in any legal proceeding directly or

17  indirectly arising out of or relating to this site (including but not limited to the

18  purchase of Mobile Fidelity Sound Lab, Inc. products) shall be in the state or

19  federal courts located in Los Angeles County, California."

20        **ANSWER:**  Defendant admits that MoFi's website contains terms and

21  conditions which includes the specific language quoted in Paragraph 15.

22  Defendant denies the remaining allegations in Paragraph 15.

23        16.   Defendant Music Direct is a Nevada corporation having its principal

24  place of business in Chicago, Illinois. Plaintiff is informed and believes and thereon

25  alleges that the CEO, CFO and President of Music Direct is Jim Davis. Plaintiff is

26  informed and believes and thereon alleges that Jim Davis is also the CEO, CFO and

27  President of MoFi. Plaintiff is further informed and believes and thereon alleges

28  that Jim Davis and Music Direct control the business operations and policies of

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

6

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

MoFi. Music Direct is also one of the principal distributors and retailers of MoFi's records, including its OMR and UD1S lines of records.

**ANSWER:** Defendant admits that Jim Davis is the President of MoFi and that Music Direct is a principal distributor and retailer of MoFi's records, including its OMR and UD1S lines of records.   Defendant neither admits nor denies the allegations in Paragraph 16 directed to Music Direct.  Defendant denies the remaining allegations in Paragraph 16.

17.     Plaintiff is informed and believes and thereon alleges that Music Direct engages in substantial business in the state of California and derives substantial revenue from sales of MoFi records and other records in California. In fact, Music Direct and Davis derive so much revenue from doing business in California that they and MoFi are funding the construction of a state-of-the-art record-pressing facility in Oxnard, California that will be the new business headquarters of MoFi commencing in early 2023.

**ANSWER:** Defendant neither admits nor denies the allegations in Paragraph 17 directed to Music Direct.  Defendant denies the remaining allegations in Paragraph 17.

18.     Plaintiff is unaware of the true identities of those Defendants sued herein as DOES 1 through 50, inclusive, and therefore sues these Defendants by these fictitious names. Each of the fictitiously named Defendants is responsible in some manner for the injuries and damages alleged by Plaintiff.  Plaintiff will seek leave of Court to amend this Complaint to show the true names and capacities of the fictitiously named Defendants if and when they are ascertained.

**ANSWER:** Denied.

19.     Each of the Defendants, including the DOE defendants, are the agents, servants, employees, partners, joint venturers, alter egos, aiders and abettors, and/or coconspirators of one or more of the remaining Defendants, and, in doing the acts alleged herein, were acting within the course and scope of said agency,

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

7

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

employment, partnership, joint venture, and/or conspiracy, or otherwise aided and abetted the others in committing the wrongs alleged here.

**ANSWER:** Denied.

## JURISDICTION AND VENUE

20.    Only the citizenship of the named parties in a class action (the representative plaintiff and defendants) is considered for diversity purposes. Accordingly, the Court has subject matter jurisdiction pursuant to 28 U.S.C. section 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. The Court also has subject matter jurisdiction under Class Action Fairness Act, 28 USC § 1332(d)(2), because this is a class action on behalf of over 100 members seeking in excess of $5 million in the aggregate.

**ANSWER:** Defendant admits that the amount in controversy in this case is sufficient to meet this Court's jurisdictional threshold and that Plaintiff is diverse from Defendant.  Denied as to the remaining allegations in Paragraph 20.

21.    Venue is proper in this District pursuant to 28 U.S.C. sections 1390(c) and 1441(a) because the U.S. District Court for the Central District of California is the federal judicial district embracing the Los Angeles Superior Court, where plaintiff originally filed this action.

**ANSWER:** Denied.

## FACTUAL BACKGROUND

### The All-Analog Production Process of Vinyl Records

22.    Before the advent of the digital age in the early 1980s, music was consumed in analog media, including vinyl records which were produced via an all-analog mastering process. A sound recording of a performance of a song or compilation of songs was recorded first on analog tape by transferring the sound from the artist's microphone into an analog sound console or mixing board that

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

creates a "mixed down" original master tape recording of the music. The original master tape would then be played on a machine known as a "lathe" to cut grooves on a fragile lacquer disc. An example of the all-analog process of cutting a lacquer from original analog master tapes on a lathe for the current Blue Note Tone Poet jazz series (a competitor of MoFi who makes AAA vinyl reissues) can be seen in this video: https://www.youtube.com/shorts/9LZYP4ovs7c. The fragile lacquer is then electroplated as part of the plating process to create a metal "stamper" that is used to press the finished vinyl record. An example of this process by Analogue Productions (another competitor of MoFi making and selling AAA reissues) is shown in the following video: https://www.youtube.com/watch?v=33ZLaR4IbAY. After the lacquer goes through the plating process, it can no longer be used to create additional stampers. Therefore, the nature of an all-analog mastering process requires access again to the analog master tape or a "safety" copy of the master to create another lacquer to plate and press additional records.

**ANSWER:** Defendant lacks sufficient knowledge to admit or deny the allegations in Paragraph 22 and therefore denies the same.

23.    Accordingly, due to the inherent nature of an all-analog mastering chain for making vinyl records, reissues of such albums can only be produced in limited quantities, which are typically numbered by the record manufacturers. This limited availability further increases the demand for such AAA records.

**ANSWER:** Denied.

24.    With the invention of digital sound formats, sound recordings became more affordable and ubiquitous. Vinyl records can also now be created or cut more cheaply from digital files than analog tapes. Therefore, with digital technology, a reissue label need only obtain a digital copy of an analog master tape or have access to the original master tape on a single occasion to make a digital recording of the tape, which could then be used multiple times to create lacquers that can be plated and used to create an unlimited number of stampers and records. For a variety of

reasons, reissue vinyl records with such a digital step in the mastering chain are nowhere near as desirable to audiophile consumers and record collectors as all-analog records.

**ANSWER:** Denied.

25.     All-analog reissues are far more desirable to audiophile consumers and record collectors than their digitally cut counterparts for several reasons. First, all-analog or AAA records generally have a distinctive, analog warm sound and ambience, which is different from the sound and ambience of records sourced from - even high quality - digital files. Second, audiophile consumers with turntables desire all-analog reissues because they are looking to replicate an original pressing of the record that is no longer available in a mint (sealed) or near-mint (like new) condition at less than an exorbitant price. By way of an example, an original, first pressing of the landmark jazz album, "*Kind of Blue*" by Miles Davis in a mint or near mint condition would likely sell for hundreds if not thousands of dollars if you could even find one. On the other hand, you could currently purchase a new, limited edition, all-analog reissue of *Kind of Blue* produced by Analogue Productions for $150. https://store.acousticsounds.com/d/148513/Miles_Davis-Kind_of_Blue-UHQR_Vinyl_Record. But, a new *Kind of Blue* vinyl record that was not represented to have been made with an all-analog process can be purchased for $18.99. https://iocorecords.com/products/miles-davis-kind-of-blue-blue-vinvl. Third, the ultimate goal of any vinyl record is to get you as close as possible to the original master tape of the musician performing live. That experience cannot be adequately replaced with some fungible digital recording of the tape. High resolution digital recordings of classic rock, jazz and other popular genres of music can be streamed for a small monthly subscription fee through streaming services such as Tidal or Qobuz, or purchased as a DSD or other digital downloadable file for a fraction of the premium prices charged by MoFi for its purported AAA records.

10

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1    **ANSWER:** Denied.

2    26.    Simply put, all-analog or AAA vinyl reissue records are in high

3    demand by audiophiles and record collectors today. They are produced in limited

4    quantities and popular titles typically sell out, creating a secondary market where

5    they often sell for a multiple of the original purchase price, just like the original

6    pressings that they replicate.

7    **ANSWER:**   Defendant admits that many of its reissue "Original Master

8    Recording" and "Ultradisc One Step" series records, whether or not they include

9    the use of what Defendant has determined is a neutral and audibly-transparent DSD

10   capture step, are in high demand by audiophiles and record collectors, are produced

11   in limited quantities, and popular titles often sell out.   Defendant denies the

12   remaining allegations in Paragraph 26.

13   **MoFi's False and Misleading Advertising and Marketing of Its Vinyl Records**

14   27.    MoFi was founded in California by Brad Miller in 1977. MoFi, based

15   in Sebastopol, California, is a record label specializing in the production of

16   audiophile reissues of classic rock, jazz and other popular genres of music. MoFi

17   produces reissued vinyl LP records and Super Audio CDs (SACDs). Plaintiff is

18   informed and believes and thereon alleges that at all times relevant hereto, MoFi's

19   records were mastered in Sebastopol, California and pressed, assembled and

20   packaged at Record Technology Incorporated (RTI) in Camarillo, California.

21   Accordingly, the materials containing the misrepresentations regarding the

22   mastering of MoFi's records emanated from California.

23   **ANSWER:** Defendant admits that it produces  audiophile reissues of classic

24   rock, jazz and other popular genres of music, that it produces reissued vinyl LP

25   records and Super Audio CDs (SACDs), that at all times relevant hereto, its records

26   were mastered in Sebastopol, California and pressed, assembled and packaged at

27

28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1  Record Technology Incorporated (RTI) in Camarillo, California.   Defendant denies

2  the remaining allegations in Paragraph 27.

3      28.    Jim Davis of Music Direct purchased MoFi in or around 2001.

4  Plaintiff is informed and believes and thereon alleges that since Jim Davis

5  purchased MoFi, he and Music Direct have invested heavily in MoFi's operations in

6  California to create and expand MoFi's vinyl reissue business as it exists today.

7      **ANSWER:** Defendant admits that Jim Davis individually purchased MoFi

8  in or around 2001 and he has invested in its operations.   Defendant neither admits

9  nor denies the allegations in Paragraph 28 directed to Music Direct.  Defendant

10  denies the remaining allegations in Paragraph 28.

11      29.    At all times relevant hereto, MoFi and Music Direct have advertised

12  and marketed their MoFi vinyl records as produced using an all-analog mastering

13  chain and until July 2022 never disclosed a digital step in the mastering process.

14  MoFi uses a claimed trademark of "Original Master Recording" on its vinyl

15  records, including its ultra-premium Ultradisc One-Step series of releases, to lead

16  audiophiles and record collector consumers who buy MoFi's records at premium

17  prices to believe its vinyl record reissues of albums bearing the OMR mark are cut

18  directly from the original analog master tapes for the albums. Indeed, for years,

19  prior to July of 2022, MoFi reassured consumers that if one of their albums had the

20  "Original Master Recording" banner on the cover, it meant the record was cut from

21  the verified analog master tapes.

22      **ANSWER:** Defendant neither admits nor denies the allegations in Paragraph

23  29 directed to Music Direct.  Defendant denies the remaining allegations in

24  Paragraph 29.

25      30.    MoFi has three distinct lines of records: (1) records labelled "Mobile

26  Fidelity Sound Labs" at top of the album (which MoFi represented were all-analog

27  and cut from analog tapes, but which MoFi could not verify that all songs on the

28  album were from the original master tapes); (2) records labelled "Original Master

12

1   Recording" at the top of the album (which MoFi represented were all-analog and

2   cut from the original master tapes); and (3) the Ultradisc One-Step (UD1S) series

3   that also has "Original Master Recording" banner at the top of each album (which

4   MoFi also represented were all-analog and cut from the master tapes using MoFi's

5   proprietary "One-Step" plating process).

6       **ANSWER:**  Defendant admits that it produces and sells records labeled

7   "Mobile Fidelity Sound Lab" and "Original Master Recording" at top of the

8   albums.  Defendant denies the remaining allegations in Paragraph 30.

9       31.     For its OMR line of records, MoFi commonly represented on its

10  website in all caps in the description for each release that it was "MASTERED

11  FROM THE ORIGINAL MASTER TAPES" and strictly limited to a certain stated

12  number of copies. In a more detailed description for each album at issue, MoFi

13  provided the following or a substantially similar description: "Mastered from the

14  original master tapes, pressed at RTI, and strictly limited to 4,000 numbered copies,

15  Mobile Fidelity's 180g 45RPM vinyl 2LP set possesses seemingly limitless

16  dynamics, reference-grade presence, expansive soundstages, and a wealth of

17  previously obscured information." See, e.g.,

18  http://web.archive.org/web/20210920221814/https://mofi.com/collections/45rpm/pr

19  oducts/grateful-dead-blues-for-allah-180g-45rpm-21p.

20      **ANSWER:**  Defendant admits that for certain records in its "Original Master

21  Recording" series it represented on its website that such records were "mastered" or

22  "sourced" from the original master recordings.  Defendant denies the remaining

23  allegation in Paragraph 31.

24      32.     The phrase "Mastered from the original master tapes" has a specialized

25  meaning in the audiophile and record collector community that means a record

26  pressed from a lacquer cut directly from the original analog master tapes of a

27  recording.

28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

1    **ANSWER:** Denied.  Defendant further answers that it is well-known and

2    understood in the music industry and audiophile and record collector communities

3    that original master tapes can be either analog or digital.

4    33.     The backside of the cover for each album in the OMR line of records

5    also states: "Mastered from the Original Master Tapes." The backside of the cover

6    for the "Mobile Fidelity Sound Lab" series of records typically states: "Mastered by

7    Krieg Wunderlich at Mobile Fidelity Sound Lab Sebastopol, CA on the GAIN 2

8    ULTRA ANALOG SYSTEM" or a substantially similar statement.

9    **ANSWER:** Defendant admits that certain of its records in its "Original

10   Master Recording" series state: "Mastered from the Original Master Tapes" on their

11   backside cover, and    certain of its records in its "Mobile Fidelity Sound Lab"

12   series state: "Mastered by Krieg Wunderlich at Mobile Fidelity Sound Lab

13   Sebastopol, CA on the GAIN 2 ULTRA ANALOG SYSTEM" on their backside

14   cover, but denies the remaining allegations in Paragraph 33.

15   34.     MoFi also included marketing and promotional material as an insert to

16   its OMR line of records, which further described the GAIN 2 Ultra Analog System

17   and its mastering process for cutting its records. The insert went around each record

18   inside the album cover and contains pictures of other MoFi premium albums,

19   including its ultrapremium UD1S series. At all times relevant hereto, the insert

20   stated as follows: "Audiophiles and serious music collectors the world over have

21   enormous respect for our contributions to the analog disc. The GAIN 2 Ultra

22   Analog System is our latest innovation. It is proprietary cutting system . . . The

23   GAIN 2 Ultra Analog System is comprised of a highly modified Studer A-80 tape

24   machine with proprietary electronics and a highly sophisticated cutting system with

25   custom amplification to drive an Ortofon cutter head on a beautifully restored

26   Neumann Lathe. . . Our Original Master Recordings only utilize actual original

27   masters as source material. The master is played back through our custom

28   electronics to extract the maximum amount of information. Due to the specialized

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

14

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

1  plating process employed, occasional pops or ticks may be present in initial

2  playback. But as the disc is played, a high-quality stylus will actually polish the

3  groove walls and improve the sound. To ensure optimum sound quality, we limit

4  the number of pressings for each release."

5       **ANSWER:**  Defendant admits that such language was included on certain of

6  its record inserts, but denies the remaining allegations in Paragraph 34.

7       35.    At all times relevant hereto, the description on MoFi's website for each

8  ultra-premium UD1S release, which was repeated on the websites of Music Direct

9  and other online retailers of MoFi's records, also typically stated in all caps:

10 

15  "MASTERED FROM THE ORIGINAL MASTER TAPES." See, e.g.,

16  http://web.archive.org/web/20210821080210/https://mofi.com/collections/ultradisc-

17  one-step/products/mfsl45udls-001_santana_abraxas_180g_45rpm_21p_box_set.

18       **ANSWER:**  Defendant admits that such language was included on its

19  website for certain of its UD1S releases.   Defendant neither admits nor denies the

20  allegations in Paragraph 35 directed to Music Direct and/or other online retailers of

21  its records.   Defendant denies the remaining allegations in Paragraph 35.

22       36.    The ultra-premium priced UD1S releases also came with an insert in

23  the box for the album that represented in words and pictures that each release was

24  an all-analog record cut from the original analog master tapes.

25       **ANSWER:**  Defendant admits that an insert containing the words and images

26  in the insert excerpt depicted in Paragraph 36 was included with certain UD1S

27  records, but those words and images speak for themselves and Defendant therefore

28

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

1    denies Plaintiff's interpretation and characterization of the inserts.  Defendant

2    denies the remaining allegations in Paragraph 36.

3         37.    In particular, the insert included with each UD1S stated as follows:

4    "Instead of utilizing the industry-standard three-step lacquer process, Mobile

5    Fidelity Sound Labs' new ULTRADISC ONE-STEP (UD1S) uses only one step,

6    bypassing two processes of generational loss. . . . **MFSL engineers begin with the**

7    **original master tapes and meticulously cut a set of lacquers**. These lacquers are

8    used to create a very fragile, pristine UD1S stamper called a 'convert.' Delicate

9    'converts' are then formed into the actual record stampers, producing a final product

10   that literally and figuratively brings you closer to the music. . . . **The exclusive**

11   **nature of these very limited pressings guarantees that every UD1S pressing**

12   **serves as an immaculate replica of the lacquer sourced directly from the**

13   **original master tapes**. Every conceivable aspect of vinyl production is optimized

14   to produce the most perfect record album available today." emphasis added). The

15   insert included with each UD1S release also contains a diagram set forth below

16   clearly depicting an all-analog mastering chain:

17        **ANSWER:**  Defendant admits that an insert containing the words quoted in

18   Paragraph 37 was included with certain UD1S records, but those words speak for

19   themselves and Defendant therefore denies Plaintiff's interpretation and

20   characterization of the inserts.  Defendant further answers that the "Ultradisc One-

21   Step Process" referenced in the insert discusses the one-step <u>plating</u> and pressing

22   process and has nothing to do with either analog or digital use in the mastering

23   process or the analog lathe laquer cutting process.  Defendant denies the remaining

24   allegations in Paragraph 37.

25        38.    At all times relevant hereto, the all-analog mastering chain diagram in

26   the insert accompanying each UD1S title was prominently displayed on MoFi's

27   website.  See, e.g., <u>http://web.archive.org/web/20210728105623/https://mofi.com/c</u>

28   <u>ollections/ultradisc-one-step</u>.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1   **ANSWER:** Denied.

2   39.   Plaintiff is informed and believes and thereon alleges that at all times

3   relevant hereto, the above representations or substantially similar representations

4   that MoFi's records were all-analog records cut from original master tapes were also

5   set forth on MoFi's website and in the individual album descriptions on the websites

6   of other online retailers of MoFi records, including Music Direct. See, e.g.,

7   http://web.archive.org/web/20211018014348/https://mofi.com/pages/technologies#

8   GAIN2_Analog.

9   **ANSWER:** Denied.

10   40.   In purchasing MoFi releases at premium prices, plaintiff and other

11   audiophile consumers of MoFi's records that comprise the putative class reasonably

12   relied upon and understood the above statements, and the diagrams in the insert to

13   the UD1S releases, which failed to disclose that the mastering process was not all-

14   analog and were instead cut from digital files, to be representations that each record

15   they purchased was an all-analog record cut from the original analog master tapes.

16   **ANSWER:** Denied.

17   41.   MoFi's false and misleading advertising and marketing of its records

18   was not limited to false and misleading representations on packaging for its records

19   and descriptions on MoFi's website and the websites of its authorized retailers.

20   **ANSWER:** Denied.

21   42.   MoFi also consistently represented in interviews that its mastering

22   process of making its records was all-analog. For example, in an article published

23   by CNET.com on April 29, 2010, MoFi's engineer Rob LoVerde was quoted as

24   saying that "every MoFi LP-'which was originally recorded to analog-is cut from an

25   analog master tape," unlike most LPs that "now are cut from digital masters." See

26   Steve Guttenberg, MoFi Remasters, Perfects LP Sound, CNET, Apr. 29, 2010,

27   https://www.cnet.com/tech/home- entertainment/mofi-remasters-perfects-lp-sound/.

28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1   **ANSWER:**  Denied.  Defendant further answers that the alleged quotes are
2   inaccurate, taken out of context, and intentionally mislead and convey a false
3   impression as to Defendant's actual and complete statements.

4   43.   On January 8, 2017, to promote MoFi's new Ultradisc One-Step line of
5   pressings, MoFi's sound engineers, Rob LoVerde and Shawn R. Britton, provided
6   an interview recorded on YouTube regarding MoFi's mastering process for its vinyl
7   records in California. In discussing the GAIN 2 ULTRA ANALOG SYSTEM used
8   to cut MoFi's vinyl records, Britton stated as follows at 1:32 of the video: **"Well,**
9   **some people ask us questions like, is it an all analog mastering chain? It is."**
10  https://www.youtube.com/watch?v=z-td3Uk5TIQ.

11  **ANSWER:**  Defendant admits that Defendant's engineers gave the interview
12  referenced in Paragraph 43, but denies the remaining allegations therein. Defendant
13  further answers that the alleged quotes are inaccurate, taken out of context, and
14  intentionally mislead and convey a false impression as to Defendant's statements.

15  44.   At the time of the January 8, 2017 interview, LoVerde and Britton and
16  defendants knew that MoFi's first UD1S release, Santana Abraxas, released in 2016
17  and shown behind LoVerde and Britton in the video, had been cut from a DSD file.
18  https://www.youtube.com/watch?v=H3Llx02KK-w&t=5s. They and defendants
19  also knew that most, if not all, of MoFi's records, including those labeled "Original
20  Master Recording," had been cut from digital since 2012.

21  **ANSWER:**  Defendant admits that it and its engineers knew that its UD1S
22  release, Santana Abraxas, contained a DSD capture step in its mastering chain, as
23  did other of its releases since 2012, but denies the remaining allegations in
24  Paragraph 44.

25  **Defendants' Fraud is Uncovered**

26  45.   On July 14, 2022, Mike Esposito, a record store owner with a popular
27  YouTube channel subscribed to by vinyl record audiophiles, released a video on his
28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1   channel "The 'In' Groove" stating that "pretty reliable sources" informed him that,

2   contrary to the company's official statements and marketing and promotion of its

3   records, "pretty much everything" that MoFi had been producing for vinyl records

4   since 2015 involved cutting its lacquers from digital files and not analog master

5   tape. Shortly thereafter, MoFi invited Esposito to California for a tour of its facility

6   in Sebastopol.  While there, MoFi staff allowed Esposito to record a video of his

7   interview of MoFi's long-time principal sound engineers, Britton, LoVerde and

8   Krieg Wunderlich that Esposito released on his YouTube channel on July 20, 2022

9   (the "July 20 Video") https://www.youtube.com/watch?v=shg0780YgAE&t=l359s.

10       **ANSWER:** Defendant admits that certain of its engineers invited Mike

11   Esposito to California for a tour of its facility in Sebastopol, and while there,

12   allowed Esposito to record a video of his interview of Defendant's engineers

13   referenced in Paragraph 45, but Defendant lacks information or knowledge

14   sufficient to form a belief as to the truth or falsity of the remaining allegations in

15   Paragraph 45 and thus denies the same.

16       46.    During the July 20 Video, Britton shockingly admitted that they had

17   been cutting MoFi records from DSD files since 2011, which included MoFi's

18   UD1S release of Santana *Abraxas*, OMR release of *Abraxas* (which like other

19   OMR releases states on the back cover, "Mastered from the Original Stereo Master

20   Tapes") and the Miles Davis catalogue released by MoFi. Britton and the other

21   engineers also indicated that all of MoFi's UD1S releases included this digital step,

22   as well as many other releases, which MoFi had previously represented were all-

23   analog records cut from the original master tapes.

24       **ANSWER:** Denied.

25       47.    MoFi's admission that it had been cutting its records from digital

26   caused consumer outrage. MoFi and Music Direct went into a damage-control

27   mode and began quickly changing the wording on their websites and marketing

28   materials to disclose for the first time the digital step in the mastering chain for their

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

records. For example, MoFi changed the description of the long-since sold-out UD1S release of Santana *Abraxas* to includes the following description: "1/4" / 15 IPS analog master to DSD 256 to analog console to lathe."

**ANSWER:** Defendant admits that it provided the mastering source provenance information: "1/4" / 15 IPS analog master to DSD 256 to analog console to lathe" for its UD1S Santana *Abraxas* release on its website, but denies the remaining allegations in Paragraph 47.

48.     MoFi also changed the diagram in the insert for its new UD1S releases to disclose the digital step in the mastering chain and the cutting of the lacquer for each record from a DSD file:



**ANSWER:** Defendant admits that the diagram in the inserts has evolved over time.  Defendant denies the remaining allegations in Paragraph 48.

**ANSWER:**

49.     On or about July 27, 2022, MoFi and Music Direct also issued a public statement, signed by Jim Davis, posted on their social media platforms in which they acknowledged that they had misled consumers regarding the mastering chain for their records:

> We at Mobile Fidelity Sound Lab are aware of customer complaints regarding use of digital technology in our mastering chain. We apologize for using vague language, allowing false narratives to propagate, and for taking for granted the goodwill and trust our customers place in the Mobile Fidelity Sound Lab brand.

BARNES & THORNBURG LLP ATTORNEYS AT LAW LOS ANGELES

We recognize our conduct has resulted in both anger and confusion in the marketplace. Moving forward, we are adopting a policy of 100% transparency regarding the provenance of our audio products. We are immediately working on updating our websites, future printed materials, and packaging – as well as providing our sales and customer service representatives with these details. We will also provide clear, specific definitions when it comes to Mobile Fidelity Sound Lab marketing branding such as Original Master Recording (OMR) and UltraDisc One- Step (UD1S). We will backfill source information on previous releases so Mobile Fidelity Sound Lab customers can feel as confident in owning their products as we are in making them.

* * *

Jim Davis

President, Mobile Fidelity Sound Lab

**ANSWER:**  Defendant admits that Jim Davis issued a public statement that was posted online and on social media platforms and that it is accurately quoted in Paragraph 49, but his words speak for themselves and Defendant therefore denies Plaintiff's interpretation and characterization of those words.

**ANSWER:**  Denied.

50.     MoFi and Music Direct charged plaintiff and other class members a premium for their OMR and UD1S releases based on misrepresentations that these releases were all-analog and the concealment of the digital step in the mastering chain for the records. Had MoFi and Music Direct disclosed that the records were cut from digital, plaintiff and other class members would not have purchased the records or would have paid substantially less for them.

**ANSWER:**  Denied.

### **Plaintiff's Purchases of Mo-Fi Records Advertised as All-Analog**

51.     Plaintiff is an audiophile and consumer of vinyl records.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1      **ANSWER:**  Defendant lacks information or knowledge sufficient to form a

2  belief as to the truth or falsity of the allegations in Paragraph 51, and thus denies the

3  same.

4      52.    Plaintiff saw and relied upon defendants' above-described

5  representations on their websites, printed materials and packaging and inserts for

6  their vinyl records regarding an all-analog mastering chain for defendants' OMR

7  line of their records, including their ultra-premium UD1S series.

8      **ANSWER:**  Denied.

9      53.    In reliance on these representations, and based on defendants'

10  concealment of the digital step in the mastering chain for their records, plaintiff

11  purchased multiple new, purportedly OMR all-analog vinyl records produced by

12  MoFi, including, but not limited to, the following UD1S releases: Yes *Fragile* (one

13  copy purchased from Alma Audio in San Diego in 2019, and a second copy

14  purchased online from Music Direct on or about February 20, 2020); and Bob

15  Dylan *Blood On the Tracks*, Marvin Gaye *What's Going On*, Thelonious Monk

16  *Monk's Dream*, and Charles Mingus *Mingus Ah Um* (purchased online from Elusive

17  Disc on or about July 7, 2020).

18      **ANSWER:**  Denied.

19      54.    Had MoFi and Music Direct disclosed that these records were cut from

20  digital files, plaintiff would not have purchased these records or would have paid

21  substantially less for them.

22      **ANSWER:**  Denied.

23              **CLASS ACTION ALLEGATIONS**

24      55.    **Class Definition**. Plaintiff brings this action on behalf of himself and a

25  class of similarly-situated persons defined as: All persons nationwide who, before

26  July 20, 2022, purchased a MoFi Original Master Recording (OMR) record or

27  UltraDisc One- Step (UD1S) record (collectively, the "Records"), hereinafter the

28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

"Class". The Class excludes persons who purchased used Records. The Class also excludes defendants and their directors, officers, employees, agents, representatives, immediate family members, joint venturers, and all persons and entities controlled by defendants or affiliated with defendants.

**ANSWER:** Denied. Defendant further denies that class certification is appropriate in this action.

56. **Numerosity**. The number of persons within the Class is substantial, numbering thousands and thousands of persons. Individual joinder of all members of the Class would be impracticable. The size and relative modest value of the claims as to each individual Class member also renders joinder impractical. Utilization of a class action is the most economically feasible means of adjudicating this matter.

**ANSWER:** Denied. Defendant further denies that class certification is appropriate in this action.

57. **Commonality and Predominance**. There are well defined common questions of law and fact that exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members. These common legal and factual questions include, among others:

    a.    Whether defendants' labeling, marketing and promotion of their Records was false, misleading and failed to disclose that the Records were not all-analog and were instead cut from digital files;

    b.    Whether defendants' conduct was unfair and/or deceptive and amounted to fraud;

    c.    Whether plaintiff and the Class members have sustained damages as a result of defendants' fraudulent and misleading conduct; and

    d.    The proper measure of their damages.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

1     **ANSWER:**  Denied. Defendant further denies that class certification is

2     appropriate in this action.

3         58.   **Typicality**.  Plaintiff's claims are typical of the claims of the Class.

4     Plaintiff and the other members of the Class were exposed to defendants' false and

5     misleading marketing, promotion and representations about the mastering of the

6     Records and concealment of the digital step in the mastering process; purchased

7     one or more Records in reliance upon the same or substantially the same all-analog

8     misrepresentations or omissions; and suffered loss or damage as a result of that

9     purchase.

10        **ANSWER:**  Denied. Defendant further denies that class certification is

11    appropriate in this action.

12        59.   **Adequacy of Representation**. Plaintiff is an adequate Class

13    representative because his interests do not conflict with the interests of the other

14    Class members he seeks to represent. He has retained counsel competent and

15    experienced in conducting consumer fraud class actions. Plaintiff and his counsel

16    will adequately protect the interests of the Class.

17        **ANSWER:**  Denied. Defendant further denies that class certification is

18    appropriate in this action.

19        60.   **Superiority**. A class action is superior to other available methods for

20    the fair and efficient adjudication of the controversy and will create a substantial

21    benefit to both the public and the courts in that: the per class-member costs of

22    prosecuting the action individually will vastly exceed the costs for prosecuting the

23    case as a class action; class certification will obviate the necessity of a multiplicity

24    of claims; it is desirable to concentrate the litigation of these claims in this forum;

25    and unification of common questions of fact and law into a single proceeding

26    before this Court will reduce the likelihood of inconsistent rulings, opinions, and

27    decisions. Moreover, members of the Class lack an adequate economic incentive to

28    pay attorneys to prosecute their claims individually and individual claims are not

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

sufficiently sizable to attract the interest of highly able and dedicated attorneys to prosecute such claims on a contingency basis.

**ANSWER:**  Denied. Defendant further denies that class certification is appropriate in this action.

61.    A class action presents far fewer management difficulties than litigating this case as hundreds or thousands of individual actions and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**ANSWER:**  Denied. Defendant further denies that class certification is appropriate in this action.

62.    The Class is ascertainable because it describes a set of common characteristics sufficient to allow members of that group to identify themselves as having a right to recover based on the descriptions.

**ANSWER:**  Denied. Defendant further denies that class certification is appropriate in this action.

63.    <u>California Law Applies to the Entire Class</u>. California has significant contacts and a significant aggregation of contacts to the claims asserted by each member of the Class, establishing California's interest in this matter such that the application of California law is not arbitrary or unfair. Plaintiff is informed and believes and thereon alleges such contacts include: (1) MoFi, founded and based in California, is a California business; (2) At all relevant times, the Records were manufactured in and originally shipped from California; (3) At all relevant times, the Record album covers and inserts containing the false representations and omissions were prepared in, printed in and shipped from California; (4) At all relevant times, advertising materials containing the false representations and omissions were prepared in, printed in and shipped from California; (5) After acquiring MoFi in California, Music Direct and its owner, Jim Davis, learned of the false representations and omissions about the Records emanating from California

1   and they allowed and encouraged the continuation of such unlawful conduct; and

2   (6) The initial admission that the Records were not manufactured using an all-

3   analog process was made in California.

4      **ANSWER:** Denied. Defendant further denies that class certification is

5   appropriate in this action.

6      64.    Indeed, in recognition of defendants' significant contacts with

7   California, the terms and conditions for MoFi's global website includes a choice of

8   California's internal laws and a choice of forum requiring litigation in Los Angeles,

9   California.

10     **ANSWER:** Denied. Defendant further denies that class certification is

11  appropriate in this action.

12                          **FIRST CAUSE OF ACTION**

13                                  **(Fraud)**

14     65.    Plaintiff realleges and incorporates by reference the allegations of

15  paragraphs 1 through 64 of this complaint.

16     **ANSWER:** Defendant incorporates by reference its responses to each of the

17  preceding paragraphs as though fully set forth herein.

18     66.    Plaintiff brings this claim individually and on behalf of members of the

19  proposed Class against defendants.

20     **ANSWER:** Defendant admits that Plaintiff purports to bring this case as a

21  class action but denies that he is entitled to any of his requested relief.

22     67.    As alleged above, defendants provided plaintiff and other members of

23  the Class with false or misleading material information about the Records,

24  including without limitation, representing the Records were "all-analog" without

25  disclosing the digital step in the mastering process for the Records. Defendants

26  concealed material information from plaintiff and other members of the Class,

27  including without limitation, failing to disclose the digital step in the mastering

28  chain for the Records and the fact that the Records were cut from digital files.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

26

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

1    **ANSWER:** Denied.

2        68.    Defendants knowingly and intentionally made numerous false and/or

3    misleading representations of material fact with the intent to deceive and/or induce

4    reliance by plaintiff and other members of the Class. Defendants also failed to

5    disclose and concealed material facts that they had a duty to disclose to prevent

6    other statements that they had made from being false and misleading, including,

7    without limitation, their failure to disclose the digital step in the mastering chain for

8    their Records. Plaintiff and other members of the Class reasonably relied on these

9    representations, omissions and concealments, which induced them to purchase the

10   Records.

11       **ANSWER:** Denied.

12       69.    Defendants' fraudulent conduct caused damage to plaintiff and the

13   members of the Class in amounts according to proof at trial.

14       **ANSWER:** Denied.

15       70.    Defendants' wrongful acts and omissions were knowingly, willfully,

16   intentionally, maliciously, oppressively and fraudulently undertaken with the

17   express purpose and intention of defrauding plaintiff and other members of the

18   Class, all to the substantial financial benefit of defendants, and each of them,

19   thereby entitling plaintiff and the Class to an award of punitive damages.

20       **ANSWER:** Denied.

21       71.    Defendants are subject to direct liability for this cause of action

22   because they each performed actions constituting fraud. Defendants are also liable

23   for: (a) conspiring with one another to defraud plaintiff and the Class; (b) furnishing

24   the means for the accomplishment of the fraud described above (by producing and

25   selling the Records made with digital recording technology while knowing the

26   Records would be advertised as all-analog); (c) aiding and abetting the fraud of one

27   another; and (d) the fraud of one another under agency, alter ego and/or joint

28   venture principles.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

27

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

1   **ANSWER:** Denied.

2                        **SECOND CAUSE OF ACTION**

3        **(Unfair Competition under Bus. & Prof. Code § 17200, *et seq.*)**

4        72.     Plaintiff realleges and incorporates by reference the allegations of

5   paragraphs 1 through 71 of this complaint.

6        **ANSWER:** Defendant incorporates by reference its responses to each of the

7   preceding paragraphs as though fully set forth herein.

8        73.     Plaintiff brings this claim individually and on behalf of members of the

9   proposed Class against defendants.

10       **ANSWER:** Defendant admits that Plaintiff purports to bring this case as a

11  class action but denies that he is entitled to any of his requested relief.

12       74.     California Business and Professions Code § 17200, et seq., (the

13  "Unfair Competition Law" or "UCL") prohibits unlawful, unfair and fraudulent

14  business practices.

15       **ANSWER:** Denied.

16       75.     Defendants' actions violate the UCL's fraudulent prong because the

17  actions were likely to, and did, deceive plaintiff and the public.

18       **ANSWER:** Denied.

19       76.     Defendants' actions violate the UCL's unlawful prong because the

20  actions constitute fraud.

21       **ANSWER:** Denied.

22       77.     Defendants are subject to direct liability for this cause of action

23  because they each performed actions constituting violations of the UCL. Each

24  defendant is also liable for: (a) conspiring with one another to violate the UCL; (b)

25  furnishing the means for the accomplishment of the UCL violations described

26  above (by producing and selling the Records made with digital recording

27  technology while knowing the Records would be advertised as all-analog); (c)

28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

aiding and abetting the UCL violations of one another; and (d) the UCL violations of one another under agency, alter ego, and/or joint venture principles.

**ANSWER:** Denied.

## THIRD CAUSE OF ACTION

### (Consumers Legal Remedies Act, Civ. Code § 1750, *et seq.*)

78.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 77 of this complaint.

**ANSWER:** Defendant incorporates by reference its responses to each of the preceding paragraphs as though fully set forth herein.

79.    Plaintiff brings this claim individually and on behalf of member of the proposed Class against defendants.

**ANSWER:** Defendant admits that Plaintiff purports to bring this case as a class action but denies that he is entitled to any of his requested relief.

80.    Plaintiff and the members of the proposed Class are "consumers" within the meaning of the Consumers Legal Remedies Act ("CLRA").

**ANSWER:** Denied.

81.    Defendants are "persons" within the meaning of the CLRA.

**ANSWER:** Denied.

82.    The CLRA makes it unlawful for any person in a transaction intended to result in the sale of goods to any consumer to represent "that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" and to advertise goods "with intent not to sell them as advertised."

**ANSWER:** Denied.

83.    The sale and advertising of the Records as alleged above are unlawful and violate the CLRA.

**ANSWER:** Denied.

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED COMPLAINT; DEMAND FOR JURY TRIAL

84.     Defendants' wrongful acts and omissions were knowingly, willfully, intentionally, maliciously, oppressively and fraudulently undertaken with the express purpose and intention of defrauding plaintiff and other members of the Class, all to the substantial financial benefit of defendants, and each of them, thereby entitling plaintiff and the Class to an award of punitive damages.

**ANSWER:**  Denied.

85.     Defendants are subject to direct liability for this cause of action because they each performed actions constituting fraud. Defendants are also liable for: (a) conspiring with one another to defraud plaintiff and the Class; (b) furnishing the means for the accomplishment of the fraud described above (by producing and selling the Records made with digital recording technology while knowing the Records would be advertised as all-analog); (c) aiding and abetting the fraud of one another; and (d) the fraud of one another under agency, alter ego and/or joint venture principles.

**ANSWER:**  Denied.

86.     More than thirty (30) days before the filing of this amended complaint adding this cause of action for violation of the CLRA, plaintiff notified defendants of the particular violations of Section 1770 alleged herein and demanded that they correct, repair, replace or otherwise rectify the goods or services alleged to be in violation of Section 1770. Defendants have failed to correct, replace or otherwise rectify their falsely advertised goods, thereby entitling plaintiff and the Class to recover actual, statutory and punitive damages according to proof at trial.

**ANSWER:**  Defendant admits it received a letter purportedly on behalf of Plaintiff, but denies the remaining allegations in Paragraph 86.

87.     To the extent the venue provision set forth in California Civil Code Section 1780(d) applies in federal court, venue in the County of Los Angeles in this District is proper because (a) defendants are doing business in Los Angeles County and within this District; and (b) based on the forum selection clause on MoFi's

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

website, which states in relevant part: "You agree that jurisdiction over and venue in any legal proceeding directly or indirectly arising out of or relating to this site (including but not limited to the purchase of Mobile Fidelity Sound Lab, Inc. products) shall be in the state or federal courts located in Los Angeles County, California." https://mofi.com/pages/terms-and-conditions.

**ANSWER:** Denied.

## PRAYER FOR RELIEF

**ANSWER:** Defendant denies that Plaintiff is entitled to the relief set forth in the Prayer for Relief.

## AFFIRMATIVE DEFENSES

Without waving or excusing the burden of proof of Plaintiff, or admitting that MoFi has any burden of proof, MoFi hereby asserts the following separate, additional, and alternative affirmative defenses.

## FIRST AFFIRMATIVE DEFENSE

MoFi alleges that the SAC, and each and every alleged cause of action therein, fails to state facts sufficient to constitute a cause of action upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

The legal and statutory claims of Plaintiff are barred by the applicable statutes of limitations.

## THIRD AFFIRMATIVE DEFENSE

This action is not a proper class action pursuant to Federal Rule of Civil Procedure 23 because: (1) Plaintiff has failed to plead, and cannot establish, the necessary procedural elements for class treatment; (2) a class action is not an appropriate method for the fair and efficient adjudication of the SAC's claims; (3) common issues of fact or law do not predominate; (4) Plaintiff's claims are not representative or typical of the putative class' claims; (5) Plaintiff is not the proper class representative; (6) Plaintiff and alleged putative class counsel are not adequate

representatives for the alleged putative class; (7) there is not a well-defined community of interest in the questions of law or fact affecting Plaintiff and the members of the alleged putative class; and (8) the alleged putative class is not ascertainable and its members are not identifiable.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because neither Plaintiff nor the putative class have sustained any losses or damages.

### FIFTH AFFIRMATIVE DEFENSE

If Plaintiff or any putative class members have sustained any damages, which Defendant denies, such were not caused or contributed to in any manner by any fault, negligence, gross negligence, fraud, want of care, or lack of due diligence by Defendant, but were caused in whole or in part by the acts or omissions of others, whether individual, corporate or otherwise, whether named or unnamed in the SAC, and for whose conduct Defendant is not responsible.

### SIXTH AFFIRMATIVE DEFENSE

If Plaintiff or any of the putative class members have sustained any damages, which Defendant denies, such were the result of intervening or superseding events, factors, occurrences or conditions, which were in no way caused by Defendant or anyone for whom it would be vicariously liable.

### SEVENTH AFFIRMATIVE DEFENSE

If Plaintiff or any of the putative class members have sustained any damages, which Defendant denies, such damages were caused in whole or in part by Plaintiff's and the putative class' failure to mitigate damages.

### EIGHTH AFFIRMATIVE DEFENSE

Neither Plaintiff, nor the putative class members, may seek restitution, disgorgement, or other equitable relief because Plaintiff alleges an adequate remedy at law.

### NINTH AFFIRMATIVE DEFENSE

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1  The claims of Plaintiff or the putative class members are barred, in whole or
2  in part, by contractual terms and conditions that are applicable to the transactions
3  alleged in this case.

4  **TENTH AFFIRMATIVE DEFENSE**

5  Any alleged damages sustained by Plaintiff or the putative class members,
6  which Defendant denies, were caused by non-parties, including potential
7  indispensable parties, who have not been joined.

8  **ELEVENTH AFFIRMATIVE DEFENSE**

9  The claims and/or alleged damages of Plaintiff or the putative class members
10  are barred, in whole or in part, by the principles of waiver and estoppel.

11  **TWELFTH AFFIRMATIVE DEFENSE**

12  The claims and/or alleged damages of Plaintiff or the putative class members
13  are barred, in whole or in part, by the defenses of unclean hands and/or laches.

14  **THIRTEENTH AFFIRMATIVE DEFENSE**

15  The claims and/or alleged damages of Plaintiff or the putative class members
16  are barred, in whole or in part, because the named Plaintiff lacks standing.

17  **FOURTEENTH AFFIRMATIVE DEFENSE**

18  To the extent any of Plaintiff or the putative class members recover in this
19  action, they have failed to properly state a claim for attorney's fees.

20  **FIFTEENTH AFFIRMATIVE DEFENSE**

21  Defendant alleges that Plaintiff or the putative class members seek to impose
22  overwhelming and disproportionate liability (by way of the aggregate or mass
23  litigation of punitive damages) in violation Defendant's substantive and procedural
24  due process rights conferred in the Constitutions of the United States, the State of
25  California, and by the substantive and due process rights conferred in any other
26  Constitutions the Court may deem applicable.

27  **SIXTEENTH AFFIRMATIVE DEFENSE**

28  The claims of Plaintiff or the putative class members are barred, in whole or

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1   in part, because neither Plaintiff nor the putative class members are not entitled to a

2   refund or repurchase.

3   **SEVENTEENTH AFFIRMATIVE DEFENSE**

4        The claims of Plaintiff or the putative class members are limited

5   damages for accepted goods.

6   **EIGHTEENTH AFFIRMATIVE DEFENSE**

7        Plaintiff's or the putative class members' claims for damages are subject

8   to reduction, to account for the value of Plaintiff's or the respective putative

9   class members' use and enjoyment of the subject records.

10   **NINETEENTH AFFIRMATIVE DEFENSE**

11        Plaintiff or the putative class members are barred from asserting each

12   and every purported cause of action alleged in the SAC and from recovering

13   any damages from Defendant, because Plaintiff or the putative class members

14   would be unjustly enriched by any such recovery.

15   **TWENTIETH AFFIRMATIVE DEFENSE**

16        Defendant's alleged failure to replace the subject records, or to refund

17   the purchase price for the subject records, was not willful.

18   **TWENTY-FIRST AFFIRMATIVE DEFENSE**

19        The SAC, and each separate cause of action alleged in it, fails because

20   Plaintiff's or the putative class members' claims have been waived and

21   terminated by release, accord, satisfaction, and/or novation and are barred by

22   the doctrine of res judicata and/or collateral estoppel.

23   **TWENTY-SECOND AFFIRMATIVE DEFENSE**

24        Certain claims asserted by Plaintiff or the putative class members fail as

25   a result of a lack of privity with Defendant.

26   **RESERVATION OF AFFIRMATIVE DEFENSES**

27        Defendant hereby gives notice that it intends to rely upon such other and

28   further affirmative defenses as may become available during discovery in this

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

34

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL

1  action and reserve the right to amend its Answer to assert any such defenses.

2  Discovery in this matter has not yet commenced and Defendant may uncover

3  additional facts and/or evidence in support of these or other affirmative defenses.

4

5

6

7  **PRAYER**

8  **WHEREFORE**, MoFi prays for judgment against Plaintiff on his SAC as

9  follows:

10      1.    That Plaintiff take nothing from his SAC;

11      2.    That the SAC against Defendant be dismissed in its entirety;

12      3.    For attorneys' fees and costs of defense;

13      4.    For such other and further relief as the Court deems is just and proper.

14

15  **JURY DEMAND**

16      Defendant demands a trial by jury on all issues so triable.

17

18  Dated:    December 16, 2022        Barnes & Thornburg LLP

19

20                    By:/s/ *Alexandra S. Kelly*
                        Alexandra S. Kelly

21                          Brian Nguyen
                        Attorneys for Defendants

22                          AUDIOPHILE MUSIC DIRECT,
                        INC. d/b/a Music Direct, a Nevada

23                          Corporation; and MOBILE
                        FIDELITY SOUND LAB, INC., an

24                          Illinois corporation

25

26

27

28

DEFENDANT MOBILE FIDELITY SOUND LAB, INC.'S ANSWER TO SECOND AMENDED
COMPLAINT; DEMAND FOR JURY TRIAL